FILED

1:07 pm, 8/28/26

Margaret Botkins
Clerk of Court

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

AMYNTAS HINCKLEY,

Plaintiff,

VS.

UNIVERSITY OF WYOMING et al,

Defendants.

Case No. 25-CV-43

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This case is brought by a pro se Plaintiff, Ms. Amyntas Hinckley ("Plaintiff"), who alleges that she was wrongfully terminated from her employment as a Marketing and Communications Specialist I at University of Wyoming because of her gender and in retaliation for protected workplace conduct. (ECF No. 11).

This matter is before the Court on Defendant University of Wyoming's Motion for Summary Judgment and memorandum in support. (ECF No. 34, 35). University of Wyoming moves to dismiss Plaintiff's two remaining claims against it, Title VII gender discrimination and retaliation. Plaintiff responded (ECF No. 37), and Defendant replied (ECF No. 38). Having reviewed the party's briefs and being otherwise fully advised, the Court finds that Defendant's Motion for Summary Judgment (ECF No. 34) should be granted. Under *McDonell Douglas Corp v. Green*, 411 U.S. 792 (1973), Plaintiff has failed to establish genuine disputes of material fact for her remaining prima facie claims and has

failed to show pretext in light of the University of Wyoming's legitimate, non-discriminatory explanation for her termination.

## FACTS[1]

**Plaintiff's Job**

Plaintiff began working for the University of Wyoming on October 2, 2023, as a Marketing and Communications Specialist, a position jointly funded by the College of Business ("COB") and Institutional Marketing. (ECF No. 11 at 3, ECF No. 37 at 3, ECF No. 37-2 at 3, 7, ECF No. 35 at 2, ECF No. 32 at 1). Her job was previously held by J.T. Cattelan, (ECF No. 11 at 3, ECF No. 35-7 at 2), and she was supervised by Justin Rowe in Institutional Marketing, but worked daily with J.T. Cattelan[2] within the College of Business. (ECF No. 37-1 at 2, ECF No. 35 at 4). Plaintiff's employment offer letter stated she would remain on probation until October 1, 2024.[3] (ECF No. 37-2 at 4, ECF No. 35 at 3).

---

[1] Unless otherwise noted, these facts are uncontested.

[2] JT Cattelan's new role was that of Marketing Manager, which provided Cattelan higher pay, more authority, and access to institutional tools and leadership. (ECF No. 11 at 3, ECF No. 35 at 3, ECF No. 35-7 at 3, ECF No. 32 at 2). JT Cattelan was promoted to the Marketing Manager position, and his role includes management of the marketing team through hiring, training, and more. (ECF No. 35 at 3, ECF No. 35-8 at 2, ECF No. 35-7 at 3, ECF No. 32 at 3-4). His express job purpose was to:

> "Manage, direct, and supervise major marketing, communication, and promotional operations for the college; manage the graphic design and production of promotional materials; provide planning, editing, writing, cost estimates, specifications, and negotiations with vendors; work under very limited supervision. Manage a marketing team that may include a marketing and communication specialist, student workers, or other marketing and recruiting personnel."

(ECF No. 35-8 at 2). Cattelan reports to Ben Cook, the Assistant Dean for the College of Business. (*Id.*; ECF No. 32 at 2-3).

[3] Plaintiff contends her probationary period ended when she was awarded a University Staff Senate scholarship for which successful completion of probation was an optional eligibility requirement. (ECF No. 37 at 2, 4-5). Plaintiff's contentions are incorrect. Her offer letter expressly stated she would remain on probation until October 1, 2024, and the University reiterated she was still on probation at the time she received the scholarship. (ECF No. 38 at 10, ECF No. 38-2 at 2). The Court notes Plaintiff omitted the response provided by University of Wyoming confirming she remained on probation.

Plaintiff's job description stated her role was to "[p]rovide leadership in the design and development of marketing and public relations strategies. Provide a strategic marketing and public relations approach that considers the integration of all marketing efforts, including the website, social media presence, publications, advertising pieces, multimedia/video pieces and communications/press releases." (ECF No. 37-2 at 11). However, Plaintiff's role did not encompass any supervisory duties, nor did she manage personnel, aside from the supervision of some interns temporarily while Cattelan was on paternity leave. (ECF No. 35 at 3, ECF No. 35-7 at 4, ECF No. 32 at 3-4). Yet, Cattelan's Marketing Manager role and Plaintiff's position of Marketing and Communications Specialist naturally had some overlap of job duties, including communication strategy, social media, newsletters, donor engagement, and department-level marketing work. (ECF No. 11 at 3, ECF No. 35 at 3).

**Plaintiff's Early Performance Failures**

Shortly after starting in her new role, Plaintiff began to display job performance issues, including being late to work, treating others poorly, and making mistakes. (ECF No. 35 at 5, ECF No. 35-7 at 3). Some of these performance issues may have been due to the lack of oversight and direction supplied by Cattelan, but Cattelan was not Plaintiff's supervisor. (ECF No. 11 at 3, ECF No. 37-1 at 3-4). Nevertheless, Plaintiff made numerous mistakes that were not a result of Cattelan's lack of guidance or oversight.

For example, in November 2023, Plaintiff was asked to prepare a press release to celebrate a UW Professor who had received a national award. (ECF No. 35 at 5, ECF No. 35-7 at 3-4, ECF No. 35-10 at 2). The professor met with Plaintiff, but found Plaintiff's

draft inadequate due to "poor writing quality and lack of accuracy." (ECF No. 35 at 5). Plaintiff responded combatively to the feedback and the press release was never published. (*Id.*, ECF No. 35-10 at 2).

On December 8, 2023, Plaintiff posted the post (set forth below) to the College of Business' social media (Instagram). The post failed to meet College of Business brand standards[4] and contained a significant spelling error, reading "Go Polks!" instead of "Go Pokes!" (hereinafter, the "first social media error"). (ECF No. 35 at 6, ECF No. 35-11 at 2, ECF No. 35-10 at 3). Cattelan highlighted this error as particularly concerning given that Plaintiff is an alumna of the University of Wyoming. (*Id.*).




On December 20, Plaintiff posted an image (set forth below) that again failed to adhere to the College of Business' brand standards, but, more problematically, depicted an image of Coca-Cola "in violation of UW's media and contractual obligations to a major

[4] College of Business brand standards can be found here and are described in Defendant's brief (ECF No 35 at 5): https://brand.uwyo.biz/. Plaintiff admits she received the university brand standards book at the start of her employment. (ECF No. 35-16 at 4).

supporter, Pepsi, a major competitor of Coke" (hereinafter, the "second social media error"). (ECF No. 35 at 7).




The first and second social media errors and other incidents, including Plaintiff mistakenly sharing outdated graduation photos that had been tagged in past years on December 13, 2023, and accidentally posting an off-brand video to UW social media (Facebook) 28 times in a row on December 23, were so egregious that in December of 2023, Rowe and Cattelan revoked Plaintiff's access to social media, requiring her to obtain approval prior to posting, while they "attempted further training." (ECF No. 35 at 7, ECF No. 35-14 at 2, ECF No. 35-11 at 2-3, 35-7 at 4, ECF No. 35-10 at 4). And, "[i]n addition to the poor quality of Plaintiff's work product, she also acted unprofessionally with peers, regularly failed to complete projects by the deadline, was often late to work, and worked remotely and used flex time without obtaining prior approval from her supervisor." (ECF No. 35 at 7). Despite further training, Plaintiff's job performance did not improve. She

consistently failed to adhere to brand, voice, and design standards and failed to execute projects independently or accurately. (*Id*. at 8, ECF No. 35-7 at 4).

**Plaintiff's Initial Concerns Regarding Disparate Treatment**

In the spring and summer of 2024, Plaintiff began to raise concerns of disparate treatment. (See ECF No. 37-2). In May or June 2024, Plaintiff met with Ben Cook, an Assistant Dean of the College of Business, and raised general concerns regarding compensation and workload compared to her and Cattelan. (ECF No. 37-2 at 24, ECF No. 35-24 at 2). In June and July 2024, Plaintiff met with Rowe multiple times, asserting she and Cattelan were treated unequally. (ECF No. 37-2 at 24, ECF No. 35-24 at 2). In summer of 2024, Plaintiff met with Cattelan and others and complained that Rowe was treating her differently than Cattelan and other COB personnel. (ECF No. 37-2 at 24, ECF No. 35-24 at 2). From July through October 2024, Plaintiff reiterated her concerns about disparate treatment to numerous colleagues. (ECF No. 37-2 at 25, ECF No. 35-24 at 3). But as detailed below, Plaintiff did not raise concerns "that she was being subjected to discrimination based upon her sex" until her meeting with Kimberly Briones in September or October 2024. (ECF No. 37-2 at 26).

**Plaintiff's Continued Poor Job Performance**

Plaintiff continued to make significant errs in her job throughout the Spring and Summer of 2024. While her performance improved slightly in spring of 2024, she still had performance issues and was removed from an MBA marketing project. (ECF No. 35 at 8, ECF No. 35-14 at 2, ECF No. 35-10 at 6, ECF No. 37-2 at 37). She was removed because she failed to prepare a pitch letter and demonstrated "poor production quality and

misaligned vision of the MBA programs." (ECF No. 35-14 at 2). Plaintiff was ultimately removed from the MBA team entirely, and her performance continued to decline once Cattelan was on paternity leave in the summer. (ECF No. 35 at 8, ECF No. 35-14 at 2, ECF No. 35-10 at 6, ECF No. 37-2 at 37). For example, the summer newsletter was delivered late and required external assistance to adhere to brand standards. (ECF No. 37 at 7, ECF No. 35 at 8, ECF No. 35-14 at 2, ECF No. 35-10 at 6). Additionally, Plaintiff failed to complete a content calendar resulting in zero social media posts from mid-June to mid-August, and she was reprimanded by Rowe as a result. (ECF No. 11 at 4, ECF No. 35 at 8, ECF No. 35-14 at 2, ECF No. 35-10 at 5).

Rowe also received reports from third parties that Plaintiff was unprofessional and discourteous while representing the COB at Cheyenne Frontier Days. (ECF No. 35 at 8, ECF No. 35-14 at 2). Specifically, Rowe received a complaint about Plaintiff being "snappy" toward an external partner during a business discussion, Plaintiff was late to the event, was dressed inappropriately, and failed to obtain proper photos during the event. (ECF No. 35-14 at 2, ECF No. 35-10 at 7, *see also* ECF No. 38-1 at 1, 36:30-41:00). She also continually failed to arrive on time to work or worked remotely or was absent from work without managerial approval.[5] (ECF No. 35-14 at 2, ECF No. 35-10 at 2). This conduct occurred despite repeated written warnings from HR and numerous discussions

[5] Plaintiff admits she arrived to work late and worked remotely but contends she did communicate sufficiently with Rowe and Cattelan regarding vacations, flex time, and remote work time. (ECF No. 35-16 at 5). The evidence shows otherwise. *See infra* note 10.

with Cattelan and Rowe where they reminded Plaintiff what the expectations were for her role.[6] (ECF No. 35-10, ECF No. 35-15 at 2, ECF No. 35-20 at 2).

**The Lead-Up to the Warning Letter**

By August 8, 2024, due to Plaintiff's poor job performance and numerous errors, Rowe confirmed Plaintiff's employment was in jeopardy, writing in an email to Cattelan:

> "I want to get all the marketing minds in a room . . . and really get clear, concise direction for her to see IF she can produce the quality of work needed. Finally, I am meeting with Renee Ballard in HR next week Wednesday to discuss steps for extending the probationary period, verbal and if needed written warnings."

(ECF No. 35-12 at 2, ECF No. 35 at 8). Cattelan and Rowe documented Plaintiff's performance issues and sent them to the UW HR Department. (ECF No. 35 at 9, ECF No. 35-7 at 5, ECF No. 35-14 at 5). HR began to draft a warning letter. (ECF No. 35-14 at 3-5).

By August 20, Cattelan had put together a report based on his and Rowe's emails over the past several months to HR. (ECF No. 35-14, ECF No. 35-10). That report detailed nearly a dozen incidents involving Plaintiff's absenteeism, tardiness, discourteous

[6] Plaintiff denies that she was "repeatedly informed in a clear and specific manner that she was failing to meet the expectations of her position" (ECF No. 32 at 6). But the undisputed evidence shows otherwise. Even assuming *arguendo* Cattelan and Rowe's feedback sessions after Plaintiff's numerous errors did not provide clear feedback, the warning letter presented to Plaintiff on September 11 and the probationary period extension letter presented to Plaintiff on September 30 clearly and specifically state Plaintiff has failed on numerous occasions to meet the expectations of her role. (*See* ECF No. 35-15 at 2 ("All employees are expected to carry out their duties, honestly, in good faith, and with diligent care." This letter has been **written to document the warning you are being given and the department's concerns with your level of work performance and behavior**. The reasons for this warning are violations of the UW Employee Handbook, **including poor work performance, failure to meet departmental expectations**, discourteous treatment, and absenteeism."); ECF No. 35-20 at 2 ("All employees are expected to carry out their duties honestly, In good faith, and with diligent care. **It is our hope that extending your probationary period will provide you with the opportunity to improve your work performance and meet our expectations on a consistent basis**.")). There is also a recording of the September 11 Meeting where Rowe and Cattelan review the warning letter with Plaintiff, address her concerns and questions, and clearly state what the expectations are in order for her to remain employed. (ECF No. 38-1 at 1). Plaintiff even admits in her own affidavit that "after the September 11, 2024 meeting, I understood that my job was in jeopardy." (ECF No. 37-1 at 12).

treatment of others, combativeness and defensiveness in response to feedback, carelessness, poor work performance, neglect of duty, and incompetency in her role. (ECF No. 35-14 at 5, ECF No. 35-10). As Cattelan explained in his report, each project Plaintiff was involved in:

> would require multiple rounds of feedback and adjustments, often becoming so taxing and time-consuming that the effort to correct the work overshadowed the original task . . . . In many cases, it became increasingly difficult to achieve the desired outcome without extensive external involvement which negated the efficiency expected from her role. While some progress was made in completing tasks, the need for constant revisions and oversight persisted, indicating a deeper issue with her ability to execute projects independently and accurately.

(ECF No. 35-10 at 6).

Cattelan observed Plaintiff was not moving tasks forward despite complaining about her workload:

> "Although she expressed frustration and complained about having too much work assigned, an examination and questioning of her workload revealed that there were only a few items on her plate at the time, indicating that the complaints were disproportionate to the actual demands of her responsibilities. In fact, many were left wondering if she had done anything at all while I was out of the office because of the lack of progress in certain areas.

(ECF No. 35-10 at 5-6).

Also by August, Plaintiff knew her repeated errors placed her job in jeopardy, and she requested Rowe and Cattelan write her a letter of recommendation for future positions of employment, stating:

> "I am just touching base with you both to see if you two would be willing to write up a general letter of recommendation. I am willing to see if we can work through the kinks that are coming up lately, but I was hoping to have those in my bag just in case we can't get it figured out."

(ECF No. 35 at 8, ECF No. 35-13 at 2, ECF No. 35-7 at 4).

H.R. drafted the warning letter by September 3, and sent it by email to Rowe and Cattelan, stating university policy was to deliver the warning letter in person. (ECF No. 35-14 at 1-4). However, Plaintiff informed Rowe she needed to take bereavement leave on September 3, 2024. (ECF No. 35 at 9, ECF No. 37-1 at 10). Rowe and Cattelan made edits to the warning letter while Plaintiff was on leave. (ECF No. 35-14 at 1-4). Rowe had planned to meet in person with Plaintiff earlier, but as a result of Plaintiff's leave, Rowe delayed meeting with Plaintiff until September 11, 2024. (ECF No. 35 at 9).

**The Warning Letter**

On September 11, 2024, after returning from bereavement leave, Rowe and Cattelan met with Plaintiff, discussed her performance, and asked Plaintiff how her work was going. (ECF No. 38-1 at 1). This meeting was recorded by Defendants.[7] (*Id.*). Plaintiff responded since January she's been attempting to "work out those kinks," including the "miscommunications" that occurred throughout the summer (ECF No. 38-1 at 1, 17:03, 17:23-17:41). It was at this time Rowe and Cattelan presented Plaintiff with the warning letter outlining her deficient performance: Plaintiff published unprofessional media posts, failed to distribute a newsletter on time, had been removed from an MBA video marketing project due to misaligned vision, and had shown poor professionalism during a Frontier

[7] To the extent it is suggested that during the meeting, Rowe raised his voice, (ECF No. 37-1 at 10), no reasonable jury could conclude such conduct was sex-based discrimination. *See Little v. Gray Media Gr., Inc.*, 790 F. Supp.3d 1195, 1231-32 (D. Kan. 2025) (internal citations omitted) (explaining employer yelling at employee and slamming hand repeatedly was not gender-based discrimination and "the source of this ire had nothing to do with plaintiff's gender . . . . [N]o reasonable jury could conclude that a manager's frustration . . . even when expressed through a tone and behavior that made plaintiff uncomfortable . . . translates to facially sex-based conduct.").

Days event. (ECF No. 11 at 4, ECF No. 37 at 5, ECF No. 37-2 at 25, ECF No. 35-15 at 2-3, ECF No. 38-1 at 1). The warning letter stated:

> The following expectations will be required moving forward:
>
> - You will carry out all your duties, honestly, in good faith, and with diligent care.
> - You will meet the performance expectations as dictated by your position and your managerial directives. **This includes meeting the quality, brand, vision, and standards of the College of Business and UW Institutional Marketing**.
> - You will treat other employees, students, the public, and external partners with respect, professionalism, and courtesy.
> - Your attendance at work will be reliable, predictable, regular, and prompt. Normal operating hours University employees are 8:00 a.m. - 5:00 p.m. Monday through Friday. **You will not utilize flex time or work remotely without the advance and appropriate authorization from your supervisor** . . . .
>
> Documentation of the warning will be kept by the supervisor and shared with Human Resources. **Please know further unprofessional or problematic misconduct by you will pose issues for your continued successful employment with the University of Wyoming.**

(ECF No. 35-15 at 3 (emphasis added)).

At the recorded meeting, after providing Plaintiff the warning letter, Plaintiff, Rowe, and Cattelan discussed the warning letter and the specific instances of Plaintiff's conduct that resulted in issuance of the warning letter and explained the expectations moving forward. (ECF No.38-1 at 1). In the meeting, Plaintiff admitted she made mistakes regarding social media, including the "Go Polks" post, and she also took accountability for the incident where she posted a video 28 times to COB social media. (ECF No. 38-1 at 1, 23:30-23:35, 24:40-25:25). When Plaintiff questioned her removal from all MBA projects, Rowe clarified that multiple people within the MBA program stated specifically they did not want to work with Plaintiff on marketing in part because she was "closed off," "not

approachable," because she works with the door closed and headphones on, she is "not open to feedback," and she consistently creates content that is off brand, resulting in a lack of trust in Plaintiff's work. (*Id*. at 26:40-27:30, 30:15-30:30, 1:06-20-1:07:10, 1:17:30-1:18:15). In response to her work with the MBA team, Plaintiff responded "I don't understand how it should be all my fault. . . there were a lot of glitches that weren't my fault." (*Id*. at 31:10-31:30).

Rowe also stated Plaintiff failed to timely complete certain important tasks during the summer, including the newsletter, and Plaintiff admitted this. (*Id*. at 33:20-36). Rowe and Plaintiff discussed Cheyenne Frontier Days ("CFD"), and Rowe reported Plaintiff failed to adequately prepare for CFD, and he was concerned with her timeliness, dress, and professionalism at the event. (*Id*. at 36:30-41:20). Plaintiff admitted she did not ask any clarifying questions to understand the scope of her responsibilities at CFD. (*Id*. at 39:28-39:35). Rowe then addressed Plaintiff's failure to create a social media calendar which resulted in no social media posts for the College of Business from June 3 through August 14. (*Id*. at 41:37-44:00).

Rowe also clarified expectations regarding her working hours. Rowe reiterated that despite other workers having different schedules and arrangements, Plaintiff's department has required hours from 8:00 a.m.-5:00 p.m. where she needs to be in person unless she has sought prior approval to work remotely or flex time. (*Id*. at 45:20-47:30). Plaintiff retorted that she was frustrated with this expectation because oftentimes, she was the only person working in person, and Rowe noted others have different work arrangements than Plaintiff. (*Id*. at 49:10-50:00). Rowe reiterated that Plaintiff must secure prior approval

before working remotely during these hours. (*Id*. at 50:25-50:05). Plaintiff contended this was unfair and it appeared to her that Rowe did not trust her. (*Id*. at 51:25-28). Rowe explained that Plaintiff failed to complete her work in the summer while Cattelan was away and that he had serious concerns with her performance, and that there *was* a lack of trust from him and other colleagues in Plaintiff's ability to complete her work. (*Id*. at 51:30-52:00). Plaintiff contended she completed everything that was asked of her. (*Id*. at 52:40-52:46). Rowe cited a recent example of giving day preparations and stated many tasks Plaintiff said were completed that were not and others had to "pick up the slack." (*Id*. at 52:46-53:02).

Cattelan explained all three members of the COB leadership team concurred on the points raised in the warning letter. (*Id*. at 1:01:15-1:01:30). Cattelan explained colleagues in the COB reported Plaintiff had shown up late for work, around 9 a.m. or 10 a.m. (*Id*. at 1:04:45-53). Plaintiff admitted to showing up late but disputed ever showing up at 10:00 a.m. and explained she worked through lunch to make up the time. (*Id*. at 1:05:15-1:06:20). Towards the end of the meeting, Rowe stated, "moving forward, these will be the new expectations . . . we are really here to get everyone on the same path on a positive note instead of looking back." (*Id*. at 1:23:40-1:24:20). Plaintiff replied ". . . I see a lot of problems with other people too that play into it and so I just feel frustrated, but I'm willing to work with this . . . it might not fix [the issues outlined in the warning letter] because there are other problems playing into it with other people as well." (*Id*. at 1:24:20-1:24:51). Rowe told Plaintiff that others are not to be blamed for her poor job performance. (*Id*. at 1:24:52-1:25:00).

Following this recorded meeting, in an email to HR, Plaintiff challenged the warning letter on September 13. (ECF No. 37-2 at 25, ECF No. 37-1 at 10, ECF No. 35 at 10, ECF No. 35-16 at 2-5). Her email response to HR following the warning letter acknowledged that she had "made mistakes," but contended she did not have "poor work performance" rather "expectations were not described, provided, or clarified." (ECF No. 35-16 at 3).[8] She explained that no one has been able to provide concrete examples of discourteous treatment towards others,[9] and she did communicate specific remote working hours to Rowe and Cattelan. (*Id*. at 3-4). Plaintiff claims she did receive the university's brand book, and she believes her work followed the brand and voice of the College of Business. (*Id*. at 4). She argued she produced all required work product for the MBA marketing project. (*Id*.). She admitted the newsletter went out late and stated "I didn't foresee the time it would take for . . . [Colleague A] and [Colleague B] to review. I do take partial responsibility for passing the deadline." (ECF No. 35-16 at 4). She explained she wore a t-shirt and jeans to Frontier Days and does not remember any inappropriate interpersonal exchanges. (*Id*.). She admitted to arriving late to work on occasion but contended she made up the time by working through lunch or into the evening. (*Id*. at 5). Notably, neither during Plaintiff's September 11 recorded meeting nor in her September 13 response letter did Plaintiff raise allegations of gender discrimination or gender-based mistreatment. (ECF No. 35 at 10, ECF No. 38-1 at 1).

---

[8] As detailed in footnote 6, the undisputed evidence establishes that expectations were made clear to Plaintiff on numerous occasions.

[9] Plaintiff's warning letter and the September 11 meeting with Rowe and Cattelan conveyed at least one example of discourteous treatment to her, and numerous other instances were documented in Rowe and Cattelan's emails to HR. (ECF No. 35-15 at 2, ECF No. 38-1 at 1).

**Plaintiff's Poor Performance After Issuance of the Warning Letter**

After the warning letter was issued on September 11, Plaintiff continually failed to meet expectations. (ECF No. 35 at 11). While Plaintiff "did not believe that [she] was refusing to perform assigned work or intentionally disregarding [her] supervisors' instructions," (ECF No. 37-1 at 13), Defendant reports her performance failed to improve: "Plaintiff failed to complete a faculty headshot project properly, failed to complete a task by the agreed upon deadline, continued to leave early and work remotely without prior approval from her supervisor, and was late to work twice." (ECF No. 37-1 at 13, ECF No. 35 at 10, ECF No. 35-21 at 3). As an example, on September 12, 2024, Plaintiff erroneously submitted a request to the IM Website team, requesting they delete three important webpages related to enrollment on the College of Business website. (ECF No. 35-21 at 3, ECF No. 35-18 at 2). This error was particularly problematic because Plaintiff had received extensive website management training, and Plaintiff failed to ask clarifying questions to her manager which could have avoided the error. (ECF No. 35-21 at 3, ECF No. 35-18 at 2). She failed to email completed headshots to faculty by September 13, 2024, and failed to inform Cattelan that the task had not been completed. Ultimately, Cattelan had to complete the task himself on September 24. (ECF No. 35-21 at 3, ECF No. 35-18 at 2). On September 19, Plaintiff failed to complete a simple marketing request of updating biographies by the agreed deadline. (ECF No. 35-18 at 3). On September 26, she emailed Cattelan stating the task would not be completed by the deadline. (*Id.*). Plaintiff also asked Cattelan to inform the client and also gather clarifying details from a new faculty member

in need of a biography. (*Id.*). These were core components of the project that she was tasked with executing. (*Id.*).

**Plaintiff's Probationary Period is Extended**

On September 26, 2024, Rowe asked if UW could move forward with terminating Plaintiff, observing "[s]ince receiving her written warning on 9/11 and in a subsequent follow up meeting on 9/17 to review the expectations of her position moving forward, Amyntas has spent considerable time looking backwards and placing blame. Rather than meeting the expectations set forth in the written warning letter, her choices suggest an inability to move forward in meeting the requirements of a Marketing and Communication Specialist." (ECF No. 35-18 at 3, ECF No. 35 at 11, ECF No. 35-18 at 2). In response, HR recommended extending her probationary period by a month first. (ECF No. 35-19 at 2). Rowe provided a probation extension letter to Plaintiff on September 30, extending Plaintiff's probationary period through November 1, 2024. (ECF No. 35-20 at 2, ECF No. 37 at 5, ECF No. 37-1 at 11).

**Plaintiff's Poor Job Performance Continued after Extension of Probationary Period**

Plaintiff continually demonstrated poor job performance even after Plaintiff's probationary period was extended and expectations for her role were reiterated. On October 7, Plaintiff failed to properly complete research and shared false information that a faculty member did not have a photo taken, and Cattelan had to locate the photo himself and complete the project. (ECF No. 35-21 at 3, ECF No. 35-17 at 2). Cattelan explained in an email to Rowe and HR that Plaintiff's lack of attention to detail "ha[s] caused pretty severe trust issues when I go to delegate tasks." (ECF No. 35-17 at 2). On October 14, Plaintiff

provided a draft marketing email to Cattelan and another Colleague, Sena Krula, and when Krula provided feedback on the email, Plaintiff responded combatively to the feedback, "resulting in poor customer service." (ECF No. 35-21 at 4, ECF No. 35-17 at 2). Due to Plaintiff's repeated combativeness and unwillingness to adjust work product to client feedback, clients and colleagues did not want to work with Plaintiff or her department, because, as Cattelan explained, "feedback/criticism is not handled well" by Plaintiff. (ECF No. 35-17 at 2, *see also* ECF No. 38-1 at 26:40-27:30, 30:15-30:30, 1:06-20-1:07:10, 1:17:30-1:18:15).

On October 14, Plaintiff left work early to work from home. While it is disputed whether she had prior approval from Rowe,[10] she continually failed to communicate about her whereabouts and vacation time when required. (*Id*., ECF No. 35-18 at 3). On October 15, Rowe wrote to HR documenting these various performance failures, stating "the basic expectations and job tasks of a Marketing and Communication Specialists [sic] that are not being completed." (ECF No. 35-17 at 3).

---

[10] Plaintiff's supervisor, Rowe, explains that Plaintiff was not only required to request leave in advance and communicate flex time or remote working hours in advance, but she was also supposed to remind the College of Business prior to each leave, remote, or flex period when she'd be working remotely or taking vacation. (ECF No. 35-18 at 3). In one instance on October 14, at 2:39 p.m. she messaged Cattelan and Rowe that she "worked through lunch today" and would be leaving early that day, just twenty minutes later at 3:00 p.m., for a family commitment and package delivery. (ECF No. 35-17 at 4). Rowe messaged her the following day, reiterating that:

> "per expectations . . . flex time and/or remote work must be previously discussed and approved. A message sent at 2:39 pm for an anticipated 3:00 pm leave does not meet this expectation. If you're planning to work through lunch in order to leave prior to the close of normal business hours, please let me know prior to noon in order to allow adequate time for review and approvals."

(ECF No. 35-17 at 4). Plaintiff responded "the way you are trying to micro-manage me is a bad management style." (*Id*. at 5). In another instance, she submitted a series of leave requests in May but failed to remind Rowe and Cattelan of her vacation until the day she was off, on September 25. (ECF No. 35-18 at 3).

Plaintiff also demonstrated a lack of professionalism and awareness following issuance of the warning letter. For example, in preparation for giving day, she requested a giving day fund be set up for her deceased significant other, but instead of addressing a memorial fund with the giving day team, she spoke directly with one of the largest donors of the COB, interfering with COB donor relationships. (ECF No. 35-17 at 2). She also brought her child to Cattelan's office to ask if she was being fired. (*Id.*). She also asked Cattelan who two coworkers were, despite having worked directly and closely with them on projects a few months before. (*Id.*).

There was also a giving day video incident that occurred.[11] On October 7, Cattelan reviewed a video put together by Plaintiff and determined it did not meet brand standards and instructed her to "scrap the video idea." (ECF No. 35 at 16, ECF No. 35-21 at 3-4). On October 9, in preparation for giving day, Plaintiff ignored Cattelan's directive to scrap the video and sent Cattelan a draft email with the video, which had not been revised and still did not meet brand standards, with incorrect usage of colors, inconsistent font, and improper tone. (ECF No. 37-2 at 139, 35-17 at 2). Plaintiff's draft email stated, "we've attached some slides and a video," to which J.T. Cattelan responded "Looks good! . . . . Go ahead and send it out!" (ECF No. 37 at 6, ECF No. 37-2 at 139, ECF No. 35-26 at 2-3, ECF No. 35-17 at 2). Cattelan did not instruct Plaintiff to remove the video or revise the proposed email before distribution. (ECF No. 37 at 6, ECF No. 35-7 at 6). Plaintiff then distributed the non-conforming video to faculty. (ECF No. 37 at 12, ECF No. 35-21 at 4,

[11] Plaintiff argues Defendants' mischaracterization of the giving day incident is a genuine dispute that precludes summary judgement. (ECF No. 37 at 12). This Court gives Plaintiff the benefit of all reasonable inferences in her favor regarding distribution of the giving day video.

ECF No. 35-17 at 2). While Cattelan acknowledged it was his "personal failure" that the video was distributed, he points out that Plaintiff was accountable for lack of adherence to branding in the video, and Plaintiff does not dispute this. (ECF No. 35-17 at 2).

**Plaintiff for the First Time Reports Discrimination on the Basis of Gender**

As discussed above, while Plaintiff met with numerous colleagues in the summer of 2024 and raised general concerns about disparate treatment, Plaintiff for the first time asserted claims of gender-based discrimination in her meeting with Employee Relations representative Kimberly Briones on September 30 or October 1. (ECF No. 37-2 at 26, ECF No. 35-24 at 4). She was referred by Briones to the Civil Rights Investigator, Alex Webber. (ECF No. 11 at 5, ECF No. 37-2 at 25, ECF No. 35 at 12, n. 2). Briones' email summarized Plaintiff's complaints regarding gender discrimination: "Men in the MBA dept have a 'boys club' mentality," she was treated differently than J.T. Cattelan, she felt "closed off" by men when she spoke in meetings, and other women felt the same and left as a result. (ECF No. 35-23 at 2). University of Wyoming's Equal Opportunity Report and Response Unit immediately began to investigate, which included an intake interview with Plaintiff.[12] (ECF No. 35-25 at 2-3).

It wasn't until October 2024, after meetings with HR, that Plaintiff complained directly to Justin Rowe about his excessive scrutiny, micromanagement, retaliation, and disparate treatment following Plaintiff's complaints concerning workplace issues. (ECF No. 37-2 at 28, ECF No. 35-24 at 5-6).

[12] Despite numerous follow-up attempts, Plaintiff failed to participate in the intake interview until the day she was terminated, October 25, 2024. (Id. at 3, ECF No. 11 at 5, ECF No. 35-24 at 6).

**Plaintiff's Termination**

Plaintiff's work performance continued to decline. Behind the scenes, Rowe and HR were moving forward with Plaintiff's termination. (ECF No. 35 at 11, ECF No. 35-22 at 2). Immediately after Plaintiff's intake interview with Webber on October 25, 2024, she had a meeting with Rowe, Cattelan, and Briones, and was presented with her termination letter. (*Id.*; ECF No. 37 at 7, ECF No. 35-24 at 6, ECF No. 37-2 at 28). Following her termination, through October 31, 2024, Plaintiff communicated with College of Business deans and administrators, the Office of the President, and the Office of General Counsel asserting the statements made regarding her discipline and termination were false, and detailing allegations of disparate treatment and retaliation. (ECF No. 37-2 at 29). In November or December 2024, Plaintiff filed a charge with the EEOC. (ECF No. 37-2 at 29).

**Plaintiff's Claims & Defendants' Contentions**

The core disagreement here centers around whether Plaintiff was terminated for the various documented instances of poor work performance or based on gender discrimination and retaliation. Plaintiff argues she made a good-faith effort to meet her supervisor's expectations during the course of her employment. (ECF No. 37-1 at 4). Plaintiff contends her work was well regarded, as she exceeded the donor goal for giving day, the University continued using marketing materials Plaintiff created after her termination, and Defendant's supervisors assigned Plaintiff responsibility for marketing initiatives immediately before her employment ended. (ECF No. 37 at 16, ECF No. 37-1 at 15). Plaintiff submits a task list demonstrating her ongoing marketing responsibilities through

October 2024. (ECF No. 37-2 at 42-137 (tasks include sending emails, updating social medial profile photos, creating slides, filming videos)). She also submits an exhibit showing that the University used a photograph she took in 2024 for giving day 2025. (ECF No. 37-1 at 15, ECF No. 37-2 at 39). Plaintiff asserts a reasonable jury could find that Defendant fired Plaintiff for reasons that were illegitimate reasons or inconsistently applied to similar employees, her termination was retaliatory and pretextual, and that despite the fact that J.T. Cattelan "was not similarly situated" to her "in every respect," they were treated differently regarding performance standards. (ECF No. 37 at 10, 16-17, ECF No. 37-2 at 28). Conversely, Defendant contends Plaintiff "was terminated after almost a year of documented, persistent performance failures that started almost immediately after Plaintiff was hired" and she "consistently failed to meet brand standards essential to her marketing role, missed deadlines, was insubordinate, and engaged in unprofessional conduct." (ECF No. 35 at 1-2).

**Procedural History**

Subsequent to Plaintiff's termination, she filed this action.[13] On January 6, 2025, Plaintiff filed her initial complaint (ECF No. 1). On April 21, 2025, this Court issued a

---

[13] On December 11, 2024, Plaintiff filed a lawsuit in Wyoming State District Court for the Second Judicial District, against the University of Wyoming asserting claims for retaliation under Title VII; "Sex-Based Discrimination"; Hostile Work Environment; Fraud and Emotional Distress, which Defendant removed to this Court on January 7, 2025. (*See* Case No. 25-CV-07; ECF No. 1 at ¶¶s 34-38; ECF No. 5). On January 14, 2025, the Defendant, University of Wyoming filed a Motion to Dismiss Plaintiff's Complaint in 25-CV-07 (ECF No. 8). In response, on January 15, 2025, Plaintiff filed an amended complaint (ECF No. 14) removing all causes of action based upon Federal law and filed a Motion to Remand her case back to State Court (ECF No. 12) asserting "this Court lacks jurisdiction over the claims asserted as they are grounded in state law and not subject to federal jurisdiction." (ECF No. 12 at 1.) Based upon *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 43 (2025), this Court agreed and remanded the case back to Wyoming State Court. (ECF No. 22). Meanwhile, Plaintiff decided to pursue her previously dismissed federal claims in the Federal District Court for the District of Colorado, filing her case there on January 6, 2025. (*See* Case No. 25-CV-043-RTG; ECF No. 1). Judge Babcock, with the Federal District of Colorado,

screening order pursuant to 28 U.S.C. § 1915, dismissing all of Plaintiff's claims for failure to state a claim. (ECF No. 10). However, the Court granted the Plaintiff leave to amend her complaint on or before May 2, 2025. (*Id.* at 7). On May 1, 2025, Plaintiff filed an amended complaint (the "Amended Complaint"). (ECF No. 11).

Plaintiff's Amended Complaint asserted the following claims against Defendants: 1) Title VII Gender Discrimination, 2) Title VII Retaliation, 3) Fraud, 4) Equal Pay Act Violation, 5) Conspiracy to Interfere with Civil Rights, 6) First Amendment Retaliation, 7) Equal Protection Violation, 8) Failure to Prevent Violations, 9) Wrongful Termination in Violation of Public Policy, 10) Intentional Infliction of Emotional Distress, 11) Tortious Interference with Prospective Economic Advantage, 12) Procedural Due Process Violation, 13) Declaratory Relief, and 14) Negligent Supervision and Willful Negligence. (ECF No. 11 at 13).

The Amended Complaint was again screened by this Court on July 30, 2025 (the "Second Screening Order"). (ECF No. 12). This Court dismissed Plaintiff's claims of Fraud, Conspiracy to Interfere with Civil Rights, First Amendment Retaliation, Equal Protection Violation, Failure to Prevent Violations, Wrongful Termination in Violation of Public Policy, Intentional Infliction of Emotional Distress, Tortious Interference with Prospective Economic Advantage, Declaratory Relief, and Procedural Due

determined venue was improper in Colorado and transferred this case to Wyoming. (25-CV-043 at ECF No. 6). In the meantime, Plaintiff's remanded state court lawsuit was ultimately dismissed by the state court judge, based upon Defendant's immunity under the Wyoming Governmental Claims Act (Wyo. Stat. § 1-39-104) and failure to exhaust under Wyoming Fair Employment Practices Act (Wyo. Stat. § 27-9-101 *et. seq.* (See ECF No. 18-1; Order Dismissing Case Without Prejudice (Second Judicial District Court, Civil Case No. 2024-CV-0036340, dated October 16, 2025).

Process Violation. (*Id.* at 22). This left four of Plaintiff's claims: 1) Title VII Gender Discrimination, 2) Title VII Retaliation, 3) Equal Pay Act Violation, and 4) Negligent Supervision and Willful Negligence. (*Id.* at 23).

Defendants Kimberly Briones, J.T. Cattelan, Justin Rowe (the "Individual Defendants"), and the University of Wyoming filed a Motion to Dismiss (ECF No. 15) and Memorandum in Support (ECF No. 16) on September 29, 2025. This Court partially granted the Motion to Dismiss and dismissed all claims against the individual defendants, and dismissed Plaintiff's equal pay act and negligent supervision claim against the University of Wyoming. (ECF No. 19). Thus, the only claims remaining are Plaintiff's Title VII Gender Discrimination and Retaliation claims against Defendant University of Wyoming. (*Id.*).

**<u>The Current Motion</u>**

University of Wyoming has filed a Motion for Summary Judgment, arguing no genuine issues of material fact exist and under applicable law it is entitled to judgment in its favor on Plaintiff's gender discrimination and retaliation claims. (ECF No. 34). For the reasons that follow, the Court agrees.

## LEGAL STANDARD

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it is necessary to determine the outcome of the case. *Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 972 (10th Cir. 2018). A dispute is genuine if evidence exists that may lead a reasonable trier of fact to return a

verdict for the non-moving party. *Olivero v. Trek Bicycle Corp.*, 291 F. Supp. 3d 1209, 1218 (D. Colo. 2017). In considering the motion, the Court views the record and all reasonable inferences in favor of the non-moving party. *Dahl v. Charles F. Dahl, M.D., P.C. Defined Ben. Pension Tr.*, 744 F.3d 623, 628 (10th Cir. 2014).

The moving party carries the burden of establishing that no genuine dispute exists and that summary judgment is appropriate as a matter of law. *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010). If the moving party carries this initial burden, then the non-moving party must submit sufficient evidence in specific factual form showing that a genuine material dispute exists. *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)). Testimony or other evidence founded on speculation is insufficient to create a genuine dispute of material fact. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 876 (10th Cir. 2004). Similarly, conclusory statements and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence. *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999); *see also Overfield v. Kansas*, 2024 WL 1611473, at *7 (10th Cir. Apr. 15, 2024) ("“Unsupported conclusory allegations do not create a genuine dispute of fact.”) (citation omitted). While it need not be submitted in a form that would be admissible at trial, evidence relied upon at the summary judgment stage must be evidence that would be admissible at trial and available to the jury. *See Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016). The existence of a scintilla of evidence in support of a plaintiff's position is insufficient—there must be evidence from which a reasonable jury could find for the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-53 (1986).

"In addition to the standards applicable to all summary judgment motions" a further consideration arises in this case because Plaintiff opposes summary judgment without the assistance of counsel. *Hammad v. Bombardier Learjet, Inc.*, 192 F. Supp. 2d 1222, 1228 (D. Kan. 2002). "It has long been the rule that pro se pleadings, including complaints and pleadings connected with summary judgment, must be liberally construed." *Id*. While this rule "requires the court to look beyond a failure to cite proper legal authority, confusion of legal theories, and poor syntax or sentence construction" it does not "require this court to assume the role of advocate for the pro se litigant." *Id*. Therefore, even in pro se cases, a "court has no duty to search the record for a litigant to find evidence supporting that litigant's summary judgment interests." *Hampton v. Barclays Bank Delaware*, 478 F. Supp. 3d 1113, 1121–22 (D. Kan. 2020), *aff'd*, 2021 WL 3237082 (10th Cir. July 30, 2021). It is with these standards in mind the Court evaluates Plaintiff's claims.

## ANALYSIS

Defendant University of Wyoming argues that Plaintiff's termination was the result of "documented, persistent performance failures," and only when Plaintiff realized her job was in jeopardy, did she raise claim of gender discrimination. (ECF No. 35 at 1-2). Defendant asserts the undisputed facts establish a "legitimate, nondiscriminatory, nonretaliatory" rationale for Plaintiff's termination in which gender played no role, and Plaintiff cannot demonstrate pretext. (*Id.* at 2). Defendant contends, and the undisputed facts show, the disciplinary process leading to Plaintiff's termination was set in motion weeks before she engaged in any alleged protected activity, and no genuine, material facts exist which would preclude summary judgment. (*Id.*).

Plaintiff argues several disputed facts preclude summary judgment: (1) characterization of the giving day incident, (2) Plaintiff's probationary status, (3) the nature of Plaintiff's protected activity and (4) the scope of Plaintiff's job responsibilities. (ECF No. 37). Plaintiff asserts Defendant's stated reasons for Plaintiff's termination were pretextual and Defendant's alleged differential application of its performance standards preclude summary judgment. (ECF No. 37 at 17-19). Plaintiff contends a reasonable jury could conclude that Defendant fired Plaintiff for reasons that were illegitimate or inconsistently applied to similar employees, and that while Cattelan "was not similarly situated" to her "in every respect," Plaintiff and Cattelan were treated differently regarding performance standards. (ECF No. 37 at 10, 16-17, ECF No. 37-2 at 28). For the reasons that follow, the Court finds there are no genuine, material issues for trial, and Plaintiff's Title VII claims fail because no reasonable jury could find Defendant's termination was based upon her gender.

Plaintiff has not presented any direct evidence of discrimination to support her claims, such as "oral or written statements on the part of a defendant showing a discriminatory motivation[.]" *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). Therefore, the Court must "determine if there is sufficient indirect evidence of discrimination for [Plaintiff] to survive summary judgment" under the burden-shifting framework first set forth in *McDonell Douglas Corp v. Green,* 411 U.S. 792 (1973). *Id*. The framework consists of three steps:

> At the first step of the analysis, a plaintiff must establish a prima facie case of [employment] discrimination. If the plaintiff succeeds, the burden of production then shifts to the employer to identify a legitimate,

> nondiscriminatory reason for the adverse employment action. Once the employer advances such a reason, the burden shifts back to the plaintiff to prove the employer's proffered reason was pretextual.

*Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1056 (10th Cir. 2020). (quotations and citations omitted).

The three-part *McDonnell Douglas* framework applies to each of Plaintiff's claims for gender discrimination under Title VII and retaliation. *Pinkerton v. Colorado Dep't of Transp.*, 563 F.3d 1052, 1064 (10th Cir. 2009) ("Where the plaintiff seeks to prove a Title VII retaliation claim through indirect or circumstantial evidence, the burden-shifting analysis of *McDonnell Douglas* .... applies."); *West v. Norton*, 376 F. Supp. 2d 1105, 1120 (D.N.M. 2004) ("In the absence of direct evidence, claims of age, race, national origin, gender discrimination, hostile work environment, and retaliation are all subject to the burden shifting framework that the Supreme Court established in *McDonnell Douglas Corp. v. Green* ...."). The Court begins by examining each of Plaintiff's prima facie claims under Title VII gender discrimination and based on retaliation before proceeding to the two remaining steps of the *McDonnell Douglas* framework, if appropriate.

## I. Title VII Gender Discrimination

"Title VII makes it unlawful 'to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (quoting

42 U.S.C. § 2000e-2(a)(1)). To set forth a prima facie case for gender discrimination, a plaintiff must establish:

> (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she qualified for the position at issue, and (4) she was treated less favorably than others not in the protected class.

*Id.*; *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021) ("a plaintiff can raise an inference of discrimination by showing differential treatment. For example, it is sufficient to show that the employer treated the plaintiff differently from similarly situated employees who are not part of the plaintiff's protected class."). "An employee is similarly situated if he "shares the same supervisor, is subject to the same standards governing performance evaluation and discipline, and has similar relevant employment circumstances, such as work history.'" *Throupe*, 988 F.3d at 1252 (internal citations omitted). When comparing employment circumstances and a work history which involves disciplinary treatment, a similarly situated employee must be one who was not in the same protected class as the plaintiff but who "engaged in conduct of 'comparable seriousness'" to Plaintiff's misconduct. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007) (citing *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006)).

Plaintiff's amended complaint states: "Defendant discriminated against Plaintiff on the basis of gender by treating her less favorably than male counterparts, including JT Cattelan. Despite performing substantially equal duties, Plaintiff was paid less, micromanaged, excluded from leadership, and disciplined under standards not applied to similarly situated men." (ECF No. 11 at 8). Defendant does not dispute that Plaintiff can

establish a prima facie case of discrimination. (ECF No. 35 at 13). Therefore, the Court will move to the second step of the burden-shifting framework.

Under the second step of the analysis, the burden of production then shifts to the employer to identify legitimate, nondiscriminatory reason for the adverse employment action. *Frappied*, 966 F.3d at 1056. A defendant's burden is "exceedingly light" to establish a legitimate, non-discriminatory reason for its challenged actions under step two of the *McDonnell Douglas* framework. *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007). It "only requires that the defendant explain its actions against the plaintiff in terms that are not facially prohibited by" Title VII. *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1317 (10th Cir. 1992). Here, the Court finds that Defendant's burden has been met, and Plaintiff has acknowledged the same. (ECF No. 37 at 10 (". . . Defendant has articulated facially legitimate reasons for its employment decision . . . .")).

Defendant contends it had a legitimate, nondiscriminatory objective reasons for terminating Plaintiff because she violated a provision of the UW Employee Handbook which states "all employees are expected to carry out their duties honestly, in good faith, and with diligent care." (ECF No. 35 at 13-14). Defendant also states poor work performance, neglect of duty, insubordination, discourteous treatment, and failure to meet departmental expectations were additional reasons for Plaintiff's termination. (ECF No. 35 at 14). Defendant has summarized Plaintiff's deficient job performance and violations of UW policies through her conduct, which include:

- Publishing a social media post that used "Go Polks" instead of the tagline "Go Pokes," in violation of UW brand guidelines;

- Failing to develop and distribute a quarterly newsletter by the deadline;
- Acting discourteously toward an external partner while representing the COB at Cheyenne Frontier Days;
- Failing to complete a content calendar, resulting in zero social media posts between mid-June and mid-August;
- Failing to arrive at work on time;
- Failing to obtain prior manager approval for remote work;
- Failing to obtain prior manager approval for flex time usage;
- Improperly attempting to remove the wrong webpages from the COB domain;
- Failing to complete a headshot task by the agreed upon deadline;
- Failing to research a file for a faculty's headshot and sharing false information related to the headshot;
- Preparing a Giving Day video that did not meet departmental production standards or adhere to UW brand guidelines;
- Distributing said video against the direction of her supervisor; and
- Providing poor customer service with respect to a marketing email.

(ECF No. 35 at 14-15).

Based on the undisputed evidence presented by Defendant, including extensive documentation regarding Plaintiff's malfeasance, Defendant has met its burden and has identified numerous, nondiscriminatory reasons for the adverse employment action. (ECF Nos. 35-10, 35-11, 35-12. 35-14, 35-17, 35-18). The evidence in the record shows Plaintiff engaged in absenteeism, tardiness, discourteous treatment of others, combativeness and defensiveness in response to feedback. Plaintiff had documented poor work performance, neglect of duty, and incompetency in her role, on a variety of occasions. Moreover, Plaintiff received numerous warnings, discussions, feedback sessions, and critiques from both Cattelan, Rowe, and in formal communications from HR, and she was given the opportunity to improve her work performance. (*See, e.g.*, ECF No. 35-10, ECF No. 35-15

at 2, ECF No. 35-20 at 2, ECF No. 38-1 at 1). Based upon the evidence submitted, Defendant has shown legitimate, nondiscriminatory reasons for the adverse actions taken against Plaintiff. Having done so the burden reverts to Plaintiff to show there is a genuine dispute of material fact that Defendant's proffered reasons for her termination are pretextual. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997); *see also Frappied*, 966 F.3d at 1056.

A plaintiff may show a genuine dispute as to pretext where such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions exist in the defendant's proffered reasons that a reasonable factfinder could rationally find them unworthy of belief. *Morgan* at 1323; *see also Pinkerton v. Colorado Dep't of Transp.*, 563 F.3d 1052, 1065 (10th Cir. 2009) (discussing plaintiff's burden in context of retaliatory discharge). Plaintiff has failed to do so here.

Plaintiff's pretext argument boils down to four sentences "supported" by only one legal citation:

> No single piece of evidence is required to establish pretext. Rather, the Court must consider the record as a whole. Viewed collectively, the evidence presented by Plaintiff is sufficient to permit a reasonable jury to conclude that Defendant's stated reasons are disputed and should not be accepted as a matter of law.
>
> A reasonable jury could conclude that Defendant's stated reasons for Plaintiff's termination are not worthy of credence based upon the inconsistencies, contemporaneous documents, and conflicting evidence discussed above. If a jury disbelieves an employer's stated explanation, it may infer that the explanation is a pretext for unlawful discrimination or retaliation. *Reeves v. Sanderson Plumbing Products Inc.,* 530 U.S. 133, 147-48 (2000).

(ECF No. 37 at 17).

To show pretext, "[t]he plaintiff is not required to come forward with direct evidence of discriminatory intent. He is only required to show 'that the employer's proffered justification is unworthy of credence.'" *Merrick v. N Nat. Gas Co., Div. of Enron Corp.*, 911 F.2d 426, 429 (10th Cir. 1990) (citing *Krause v. Dresser Ind., Inc.*, 910 F.2d 674, 677 (10th Cir. 1990). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)); *see also Little v. Gray Media Gr., Inc.*, 790 F. Supp. 3d 1195, 1251 (D. Kan. 2025) (citing *Young v. Dillon Cos., Inc.,* 468 F.3d 1243, 1250 (10th Cir. 2006)) ("To meet this burden, plaintiff must provide evidence that 'the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable factfinder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination' or retaliation.").

Importantly, though, when considering whether the proffered reason was pretextual, the Court must "examine the facts as they appear to the person making the decision[,] not the plaintiff's subjective evaluation of the situation." *Id.* (quoting *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011)). The examination asks, "not whether the employer's proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Id.* (quoting *Luster*, 667 F.3d at 1094). And, a plaintiff's "unsubstantiated allegation" that the employer's "explanation was

false cannot serve as evidence of pretext." *Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 F. App'x 897, 905 (10th Cir. 2011). Therefore, when alleged misconduct leads to the plaintiff's termination, it does not matter whether the misconduct actually happened, what matters is whether the employer's decision-maker believed in good faith that it did. *Id.*

As an initial matter, Plaintiff's arguments fail to flesh out and explain what "inconsistencies, contemporaneous documents, and conflicting evidence" establish pretext. (ECF No. 37 at 17). Even construing Plaintiff's response liberally, this Court is unable to identify any pretext based on Plaintiff's vague arguments. Nor does the undisputed evidence show "'the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable factfinder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination' or retaliation." *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006).

Plaintiff's arguments regarding pretext are conclusory, unsupported, undeveloped, and contain no citations to the summary judgment record. *See Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007) ("Even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat summary judgment. Mere conjecture that the employer's explanation is pretext is insufficient basis to defeat summary judgment."). And Plaintiff may not leave "it for the court to dig around in mountains of exhibits and perhaps, one supposes, find something plaintiff hasn't bothered to identify. The court declines. It won't rifle through stacks to determine whether the record supports plaintiff's abstract propositions." *Little*, 790 F. Supp. 3d at 1252 (citing *Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 56 F.4th 913, 927 (10th Cir. 2022))

("'Judges are not like pigs, hunting for truffles buried in briefs.'"). Plaintiff's unsupported and undeveloped arguments are insufficient to carry Plaintiff's burden to show pretext. *See Little*, 790 F. Supp. 3d at 1252 (collecting cases).

And, Defendant has articulated several legitimate, non-discriminatory reasons for Plaintiff's termination. The facts as they appeared to Justin Rowe showed Plaintiff was incompetent in her role and was unwilling to meet the basic expectations of her position. Even after a formal written warning by HR, an additional written warning through Plaintiff's probation extension letter, and numerous meetings discussing expectations with Rowe and Cattelan (ECF No. 35-10, ECF No. 38-1 at 1), Plaintiff continually failed to meet the requirements of her role and her job performance declined over time. Rowe's reliance on feedback from COB and MBA personnel stating they did not want to work with Plaintiff due to her bad attitude, poor work product, and lack of trust were legitimate, nondiscriminatory reasons for Plaintiff's discharge. So too was Rowe's reliance on his and Cattelan's personal experiences working with Plaintiff, where they witnessed her attention to detail issues, failure to adhere to branding standards, combative attitude, failure to implement feedback, and failure to improve after the issuance of written warnings by HR.

Plaintiff fails to show Defendant's stated reasons for terminating her were a mere pretext or that she incurred disparate treatment. *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007); *see also Mann v. XPO Logistics Freight, Inc.*, 819 Fed. App'x. 585, 595 (10th Cir. 2020) (quoting *Kendrick*, 220 F.3d at 1230) ("Typically, a plaintiff will take one of three routes to establish pretext: "(1) with evidence that the defendant's stated reason for the adverse employment action was false . . ."); *Herrera v.*

*United Airlines, Inc.*, 754 Fed. App'x. 684, 692 (10th Cir. 2018) ("A common method of showing pretext is by arguing disparate treatment.").

Plaintiff has failed to show the existence of a genuine dispute by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's proffered reason "that a reasonable factfinder could rationally find [the reason] unworthy of credence and hence infer that [his] employer did not act" on that basis. *Pinkerton*, 563 F.3d at 1065. To the contrary, University of Wyoming staff, including Rowe and Cattelan, meticulously documented the numerous instances of Plaintiff's poor job performance. (ECF Nos. 35-10, 35-11, 35-12. 35-14, 35-17, 35-18). While Plaintiff disputes some of the characterization of these, the vast majority of incidents of Plaintiff's poor job performance are undisputed or admitted. (*See, e.g*., ECF No. 38-1 at 1, ECF No. 35-16). She does not dispute the numerous social media errors were her fault. Plaintiff admits she received the university's brand book and she contends that her work followed the brand and voice of the College of Business. (ECF No. 35-16 at 4.) Yet, no reasonable jury could find her social media posts adhered to COB brand guidelines. The failure to follow the brand guidelines is as simple as "Coca-Cola" versus "Pepsi" or "Polks" v. "Pokes." And Plaintiff's subjective beliefs and speculation that her work adhered to branding guidelines is not competent summary judgment evidence. *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999); *Overfield v. Kansas*, 2024 WL 1611473, at *7 (10th Cir. Apr. 15, 2024).

**Plaintiff's Posts**







**Posts Adhering to COB Branding Guidelines**










Plaintiff also admitted to failing to develop and distribute a quarterly newsletter[14] by the deadline. (ECF No. 35-16 at 4 ("I didn't foresee the time it would take for . . .

[14] Additionally, regarding Plaintiff's claims that she was reprimanded for publishing a newsletter late while Cattelan was not reprimanded for the same behavior, Plaintiff fails to acknowledge she was fired for many different reasons outlined in ECF No. 35 at 14-15. Even giving Plaintiff the benefit of drawing all inferences in her favor, Defendant's argument is well taken that Plaintiff:

> "ignores the compound nature of her ultimate discharge. Plaintiff was not discharged solely for publishing a newsletter late. Rather, her discharge was the result of a long list of misconduct, including failure to meet brand standards, regularly being late and working remotely without obtaining supervisor approval, poor customer service, and an overall inability to complete her job duties in accordance with departmental standards."

(ECF No. 35 at 20).

[Colleague A] and [Colleague B] to review. I do take partial responsibility for passing the deadline.")) She does not dispute that she acted discourteously towards an external partner at Cheyenne Frontier Days, rather she asserts she does not remember having any inappropriate personal exchanges, and she also acknowledges arriving to work late. (ECF No. 35-16 at 4). Plaintiff does not dispute that she failed to complete the content calendar and instead blames Cattelan for instructing her not to post on social media. (ECF No. 35-16 at 5). She does not challenge that she had numerous instances of poor work performance, including improperly attempting to remove the wrong webpages from the COB domain after extensive website management training, and failing to complete a headshot task by the agreed upon deadline. Nor does Plaintiff dispute she failed to research a file for a faculty's headshot and shared false information related to the headshot, prepared a Giving Day video that did not meet departmental production standards or adhere to UW brand guidelines, and provided poor customer service with respect to a marketing email. She also admits to routinely arriving late to work. (ECF No. 35-16 at 5). At bottom, Plaintiff fails to show the Defendant's stated reason for the adverse employment action was a mere pretext.

Additionally, based upon the undisputed facts, no reasonable factfinder could rationally Plaintiff was subjected to disparate treatment. To establish disparate treatment, Plaintiff must show the employee was 'treated differently from other similarly situated employees who violated work rules of comparable seriousness.'" *Swackhamm*er, 493 F.3d at 1167-68. "An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the 'same standards governing performance

evaluation and discipline.'" *Kendrick*, 220 F.3d at 1232 (quoting *Aramburu v. Boeing Co.*, 112 F. 3d 1398, 1404 (10th Cir. 1997). "'A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated.'" *Id.* (quoting *Aramburu*, 112 F. 3d at 1404 (10th Cir.); *see Sprague v. Thorn Americas, Inc.,* 129 F. 3d 1355, 1364 (10th Cir. 1997) (quoting *Nulf v. Int'l Paper Co.*, 656 F.2d 553, 560 (10th Cir. 1997) ("the jobs 'must be "substantially equal" in terms of "skill," "effort," "responsibility," and "working conditions."'")

Plaintiff cannot establish pretext on the basis of disparate treatment because Plaintiff and Cattelan were *not* similarly situated.[15] The evidence demonstrates Cattelan served in a wholly separate role from Plaintiff, and he reported to a different supervisor by Plaintiff's own admission. (ECF No. 35-8 at 2, ECF No. 32 at 2-3). Cattelan held a supervisory role. Plaintiff did not. Plaintiff temporarily supervised interns because Cattelan was on paternity leave. (ECF No. 35 at 19-20). Indeed, the stated purpose in the Marketing Manager role compared to the purpose stated in the Marketing & Communications Specialist job description supports that Cattelan and Plaintiff were not similarly situated in their respective roles. (*Compare* ECF No. 35-8 at 2 (purpose of Marketing Manager is to "[m]anage, direct, and supervise major marketing, communication, and promotional

[15] Plaintiff contends Defendant's mischaracterization of her job responsibilities creates a dispute of fact that precludes summary judgment. (ECF No. 37 at 14). Plaintiff is mistaken. In reaching its conclusion, the Court considered the evidence underlying each party's assertions, including University of Wyoming's official job descriptions for the respective positions. (ECF No. 35-8 at 2, ECF No. 37-2 at 11). It is not disputed based on the facts, the law, and the evidence presented that Cattelan and Plaintiff were not similarly situated. *See Overfield v. Kansas*, 2024 WL 1611473, at *5 (10th Cir. Apr. 15, 2024) ("Similarly situated employees share a supervisor, must follow the same standards, and must engage in comparable conduct.").

operations for the college; manage the graphic design and production of promotional materials; provide planning, editing, writing, cost estimates, specifications, and negotiations with vendors; **work under very limited supervision**. **Manage a marketing team that may include a marketing and communication specialist, student workers, or other marketing and recruiting personnel**”) *with* ECF No. 37-2 at 11 (purpose of Marketing & Communications Specialist is to “[p]rovide leadership in the design and development of marketing and public relations strategies. Provide a strategic marketing and public relations approach that considers the integration of all marketing efforts, including the website, social media presence, publications, advertising pieces, multimedia/video pieces and communications/press releases.”).

Nor has Plaintiff demonstrated Cattelan violated comparable work rules. (ECF No. 38 at 9). Having failed to show disparate treatment or that Defendant’s reasons for terminating Plaintiff were pretext, Plaintiff has not carried her burden under the *McDonnell Douglas* burden-shifting framework. Plaintiff has failed to present evidence to show Defendant’s explanation for her termination was “‘so weak, implausible, inconsistent, or incoherent that a reasonable factfinder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination’ or retaliation.” *Little*, 790 F. Supp. 3d at 1251 (quoting *Young*, 468 F. 3d at 1250). Thus, Defendant is entitled to summary judgment in its favor on Plaintiff’s employment-discrimination claims on the basis of gender.

## II. Title VII Retaliation

Next, Plaintiff asserts a retaliation claim under Title VII. (ECF No. 11 at 8). Plaintiff states in her complaint that on either September 30 or October 1, 2024: “Plaintiff engaged

in a protected activity by reporting misconduct and discrimination to HR, the Ombudsman, Civil Rights, and the University President. In response, she was subjected to false discipline, increased scrutiny, threats of job loss, and termination." (ECF No. 11 at 8).

Defendant contends that Plaintiff did not engage in a protected activity until she first reported gender discrimination to Kimberly Briones on September 30 or October 1, and by then, Plaintiff's performance was so deficient Rowe had already decided to terminate her. (ECF No. 35 at 23). Plaintiff's discharge was simply the completion of a disciplinary process previously set in motion. (ECF No. 35 at 23-24). Defendant also asserts, similar to the gender discrimination analysis, Defendant had numerous legitimate reasons for terminating Plaintiff, and Plaintiff cannot demonstrate pretext. (ECF No. 35 at 24).

A prima facie Title VII retaliation claim requires Plaintiff show: (1) she engaged in protected activity; (2) the employer took adverse employment action against her; and (3) there exists a causal connection between the protected activity and the adverse employment action. *Annett v. University of Kansas*, 371 F.3d 1233, 1237 (10th Cir. 2004). A successful Title VII retaliation claim ultimately requires Plaintiff "establish that retaliation played a part in the employment decision." *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008).

Assuming for purposes of the argument that Plaintiff has satisfied the first two elements, in evaluating the third, the Court finds Defendant's reliance on *Morgan v. Hilti, Inc*. determinative. 108 F.3d 1319, 1324 (10th Cir. 1997). In *Morgan*, the Tenth Circuit concluded it was "questionable" whether Plaintiff made a sufficient showing on causation because Plaintiff's employer had issued written warnings regarding the consequences of

poor job attendance *before* Plaintiff engaged in a protected activity. Thus, the Court found the discharge after the protected activity occurred simply "completed the disciplinary process already set in motion." *Id*. Here too, Defendant had issued a formal warning letter on September 11, several weeks before Plaintiff engaged in the alleged protected activity of reporting gender discrimination to Kimberly Briones on September 30 or October 1. (ECF No. 35-15 at 2).

Plaintiff's response asserts she engaged in protected activity prior to reporting gender discrimination to Kimberly Briones on either September 30 or October 1, 2024. (ECF No. 37 at 5, 15). The case law does not support Plaintiff's assertion:

> An employee's "[p]rotected opposition can range from filing formal charges to voicing informal complaints to superiors." *Hertz v. Luzenac America, Inc*., 370 F.3d 1014, 1015 (10th Cir. 2004). "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]. General complaints about company management ... will not suffice." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). "[T]he absence of a reference to unlawful discrimination ... can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII." *Petersen v. Utah Dep't of Corrs.*, 301 F.3d 1182, 1188 (10th Cir. 2002); *see also Anderson v. Acad. Sch. Dist*. 20, 122 F. App'x 912, 916 (10th Cir. 2004) ("[A] vague reference to discrimination and harassment without any indication that this misconduct was motivated by race (or another category protected by Title VII) does not constitute protected activity and will not support a retaliation claim.")

*Iweha v. State of Kan.*, 121 F.4th 1208, 1233-34 (10th Cir. 2024); *see also Little v. Gray Media Gr., Inc.*, 790 F. Supp. 3d 1195, 1242 (D. Kan. 2025) (quoting *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004) ("making 'a vague reference to discrimination and harassment without any indication that this

misconduct was motivated by [gender] . . . does not constitute protected activity and will not support a retaliation claim.'"').

Plaintiff's assertion that her protected activity began prior to her reports of gender discrimination to Briones are not only contrary to law but also directly contradict Plaintiff's amended complaint and an exhibit attached to her response. (*See* ECF No. 11 at 5 (explaining Plaintiff first reported gender discrimination to Kimberly Briones on September 30); ECF No. 37-2 at 26 (explaining Plaintiff "specifically raised concerns that she was being subjected to discrimination based upon her sex" at her meeting with Briones). And, as Defendant correctly points out, Plaintiff's discussions with colleagues prior to her September 30 or October 1, 2024 conversation with Briones did not raise gender-based discrimination, but rather concerned disparate treatment between her and Cattelan. (ECF No. 38 at 2-3, ECF No. 37-2 at 24-26). Such vague and conclusory statements complaining about her employer are insufficient to constitute protected activity. *Iweha*, 121 F.4th at 1233-34 (10th Cir. 2024). In any event, Plaintiff's argument that the protected activity occurred prior to her meeting with Briones is immaterial. Plaintiff failed to meet her burden to demonstrate Defendant's legitimate non-discriminatory reasons for her termination were pretextual.

Even assuming *arguendo* that Plaintiff had met her burden to establish causation on her prima facie claim of retaliation, the Court concludes (1) the University of Wyoming has identified numerous legitimate, non-discriminatory reasons for Plaintiff's discharge, and (2) Plaintiff has failed to show that these non-discriminatory reasons are pretextual to mask a retaliatory motive by Defendant University of Wyoming. As set forth above, ample

legitimate, nondiscriminatory objective reasons support Rowe and Defendant's decision to terminate Plaintiff after repeated warnings and failures to improve her job performance. As aptly observed recently by Judge Crabtree:

> Title VII also doesn't shield employees "from reprimands for disappointing progress or poor work performance[.]" *Overfield*, 2024 WL 1611473, at *6 (citing *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1545–46 (10th Cir. 1995)). Specifically, unless evidence suggests "that the employee's sex played a role in those reprimands[,]" an employee's "'actual performance'" can supply "a 'legitimate basis' for differential treatment." *Id*. (quoting *Garrett*, 305 F.3d at 1218). *Overfield* thus concluded that Title VII didn't protect against Judge Johnson's allegedly harsh treatment of a female employee—one who needed to do a "better job" when she hadn't progressed with her court reporter certification. *Id*. Instead, "a nondiscriminatory motive"—the employee's actual job performance—explained Judge Johnson's "differential treatment[.]" *Id*. (quotation cleaned up).

*Little v. Gray Media Gr., Inc.*, 790 F. Supp. 3d 1195, 1232 (D. Kan. 2025). Here too, the undisputed evidence shows Plaintiff's poor job performance explains any alleged "differential treatment."

Plaintiff's conduct, unprofessional attitude, job performance, along with her September 13, 2024, rebuttal admitting to many of her performance failures were more than enough evidence for the University of Wyoming to terminate her. *See Overfield v. Kansas*, 2024 WL 1611473, at *6 (10th Cir. Apr. 15, 2024) ("We have recognized 'actual performance' as a 'legitimate basis' for differential treatment."). And in terminating her, Rowe relied upon feedback from third parties, including COB leadership and the MBA team, and his and Cattelan's own experience working with Plaintiff through numerous and repeated performance failures. These are legitimate, nondiscriminatory reasons supporting University of Wyoming's decision to ultimately terminate Plaintiff.

And, as discussed above, Plaintiff's arguments regarding pretext are unsupported, undeveloped, and contain no citations to the summary judgment record, and the Court declines to serve as Plaintiff's truffle pig. *See Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007) ("Even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat summary judgment. Mere conjecture that the employer's explanation is pretext is insufficient basis to defeat summary judgment."); *Little*, 790 F. Supp. 3d at 1252 (citing *Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 56 F.4th 913, 927 (10th Cir. 2022)) ("'Judges are not like pigs, hunting for truffles buried in briefs.'").

Plaintiff has failed to present evidence from which a reasonable juror could find that Defendant's stated reasons for Plaintiff's termination are unworthy of belief and thus infer retaliation for engaging in protected activity. *See Pinkerton*, 563 F.3d at 1065. Accordingly, as with the gender discrimination claim, the University of Wyoming is entitled to summary judgment on Plaintiff's retaliation claim under Title VII.

## CONCLUSION AND ORDER

Even construing Plaintiff's pro se opposition to summary judgment liberally, Plaintiff has failed to show a dispute of material fact for each of the prima facie claims remaining in her Complaint and no reasonable jury could find that the legitimate, non-discriminatory and non-retaliatory reasons University of Wyoming gave for Plaintiff's termination were a pretext. Therefore, it is hereby

**ORDERED** that the Defendant University of Wyoming's Motion for Summary Judgment (ECF No. 34) is **GRANTED**. Summary judgment is hereby entered in

Defendant's favor on all of Plaintiff's claims. The Clerk of Court's Office shall enter judgment in Defendant's favor and close this case.

Dated this 28th day of August, 2026.

Scott W. Skavdahl
United States District Judge